Armin GRABOWSKI, Herbert Blesch, Dieter Wurdig, Gunter Huber, Stephen Carter Corby, Thomas Kriesl, Willem Adriaanse, Klaus George Weigand, and Upclass Investments, Ltd., Plaintiffs,

v.

BANK OF BOSTON, Kinder Capital, Inc., Continental Capital Markets, Inc. Norman Epstein, Harold Glantz, Guido Haak and Arthur James Laycock, Defendants,

and

John Does 1 Through 100, Defendants,

and

National Union Fire Insurance Company of Pittsburgh, PA, Intervenor.

Civil Action No. 94–11461–PBS.

United States District Court, D. Massachusetts.

March 11, 1998.

Michael A. Collora, Dwyer & Collora, Boston, MA, for Gunter Huber, Stephen Carter Corby, Thomas Kriesl.

Robert Axelrod, Axelrod, Lanzoni & Teague, Meriden, CT, Michael A. Collora, Dwyer & Collora, Boston, MA, for Willem Adrianse, Upclass Investments, Ltd.

Robert Axelrod, Axelrod, Lanzoni & Teague, Meriden, CT, Michael A. Collora, Dwyer & Collora, Boston, MA, Christopher Weld, Jr., Todd & Weld, Boston, MA, for Klaus George Weigand.

Harold Jacobi, III, Robert C. Cooley, Jacobi & Associates, Boston, MA, for Bernd Weber.

Robert Christo, Robert Christo & Associates, Springfield, MA, Timothy M. Kotfila, Law Office of Timothy Kotfila, Springfield, MA, for National Union Fire Ins. Co., Pittsburgh.

Thomas H. Walsh, Jr., S. Elaine McChesney, Peter J. Mancusi, Laura A. Clark, Bingham, Dana & Gould, Boston, MA, for Bank of Boston.

Paul Markham, Melrose, MA, for Kinder Capital, Inc., Norman Epstein.

Richard Ben–Veniste, Weil, Gotshal & Manges, Washington, DC, for Continental Capital Markets, Inc., Harold Glantz.

David J. Burgess, Michael A. Collora, Dwyer & Collora, Boston, MA, for Dieter Wurdig.

## MEMORANDUM AND ORDER

SARIS, District Judge.

On August 7, 1997, I issued a memorandum and order on motions and cross-motions for summary judgment. This triggered three motions, which I now address.

### 1. *Grabowski redux*

The Bank of Boston has filed a motion for reconsideration and rehearing (Docket No. 263), together with numerous memoranda, which rehash most of the arguments raised in the initial rounds of briefing. I will discuss three new arguments, only one of which flies.

■ First, apparently trying to conflate the concepts of authorization and authenticity, the Bank relies on language in comment 1 to M.G.L. c. 106 § 4A–203 to support its argument that an order is "authorized" if it was sent by the person who purportedly sent it. Here, the Bank's argument continues, "each order was authentic and 'authorized' because it was sent by Epstein, who was the identified sender of the order. Article 4A would have meaning in the context only if the orders were made by someone else pretending to be Epstein." (Docket No. 264, p. 9). However, I conclude that the commentary supports the use of the law of agency in this situation when it states:

> If the person identified as the sender of the order refuses to pay on the ground that the order was not authorized by that person, what are the rights of the receiving bank? In the absence of a statute or agreement that specifically addresses the issue, the question usually will be resolved by the law of agency. In some cases, the law of agency works well. For example, suppose the receiving bank executes a payment order given by means of a letter apparently written by a corporation that is a customer of the bank and apparently signed by an officer of the corporation. If the receiving bank acts solely on the basis of the letter, the corporation is not bound as the sender of the payment order unless the signature was that of the officer and the officer was authorized to act for the corporation in the issuance of payment orders, or some other agency doctrine such as apparent authority or estoppel causes the corporation to be bound.

The bank emphasizes the following underlined language in a later portion of Official Comment 1 discussing cases where the transmission of the payment order is made electronically and the receiving bank may be required to act on the basis of a message on a computer screen:

> In a very large percentage of cases covered by Article 4A, transmission of the payment order is made electronically. The receiving bank may be required to act on the basis of a message that appears on a computer screen. Common law concepts of authority of agent to bind principal are not helpful. There is no way of determining the identity or the authority of the person who caused the message to be sent. The receiving bank is not relying on the authority of any particular person to act for the purported sender. The case is not comparable to payment of a check by the drawee bank on the basis of a signature that is forged. Rather, the receiving bank relies on a security procedure pursuant to which the authenticity of the message can be "tested" by various devices which are designed to provide certainty that the message is that of the sender identified in the payment order. *In the wire transfer business the concept of "authorized" is different from that found in agency law.* In that business a payment order is treated as the order of the person in whose name it is issued if it is properly tested pursuant to a security procedure and the order passes the test.

Thus, Article 4A deals with authenticity of the message with the security procedures in § 4A–202 (b). However, whether the message is authorized is resolved by resorting to the law of agency.

Based on the undisputed facts in the record, whether this case is analyzed under agency or contract law, Epstein was unauthorized to issue the payment order under the plain and unambiguous terms of the limited power of attorney which the bank accepted when the funds were deposited.

Second, in its reply brief (Docket No. 278, p. 10), the Bank makes a conclusory, cursory argument that Epstein, while acting within the scope of his agency for the plaintiffs, fraudulently induced the bank to accept the limited power of attorneys by making material misrepresentations as to its scope and terms. However, the argument was without either record or case support and I reject it.

Third, in a sur-reply, the Bank submits an unauthenticated document indicating that plaintiff Grabowski has pleaded guilty to charges that the money he placed on deposit with the Bank had been obtained by fraud in thirty instances from several hundred German nationals. On May 13, 1997, he was sentenced to a total term of imprisonment of three years and nine months. The sentencing opinion of the Regional Court in Stuttgart is deeply troubling because the statement of the prosecutor would support a conclusion that Grabowski either knowingly entered into a fraudulent agreement with Epstein, who himself has entered into a guilty plea at this time, or that Grabowski was willfully blind to Epstein's fraud. Plaintiff Grabowski objects to the submission of the German Court's opinion on the ground that it was not properly authenticated pursuant to Fed.R.Evid. 902(3). The Bank shall have thirty days to authenticate the document and have it translated by a certified interpreter.

Here, the agency principles, which the Bank tries so hard to eschew, may well protect it from liability. Comment 1 to § 4A–203 provides:

> Estoppel can be illustrated by the following example. Suppose P is Aware that A, who is unauthorized to act for P, has fraudulently misrepresented to T that A is authorized to act for P. T believes A and is about to rely on the misrepresentation. If P does not notify T of the true facts although P could easily do so, P may be estopped from denying A's lack of authority. A similar result could follow if the failure to notify T is the result of negligence rather than a deliberate decision.

This plea of guilty may well as a matter of law estop Grabowski from claiming Epstein was unauthorized.

The hold-up here is my lack of familiarity with German criminal procedure. It is unclear to me whether defendant Grabowski in

the German Court pleaded guilty to the prosecutor's statement of facts; whether he had the opportunity to dispute that statement of facts; whether one or more of the instances of fraud to which he pleaded guilty specifically encompassed the Kinder Capital arrangement; and whether there is any disputed issue of fact concerning the matters in the Stuttgart Court's opinion. Within thirty days, Grabowski shall submit a brief (within the page limit) on the legal effect of the guilty plea; the Bank will have the usual time period (and page limit) for a response. The Bank has also suggested that four other plaintiffs are similarly facing charges with respect to fraudulent transactions and may be similarly estopped. This, too, should be briefed. Grabowski may file a five page reply. There shall be no sur-replies, sur-sur-replies, or surly replies.

### 2. *Huber*

■ Plaintiff Gunter Huber has filed a motion for reconsideration of the Court's partial denial of his summary judgment motion and partial allowance of the Bank of Boston's summary judgment motion. (Docket No. 267). He has also filed a request for supplemental findings of fact and conclusions of law.

Huber argues that this Court erred by deciding as a matter of law that the general, unlimited Bank power of attorney on September 24, 1993, executed at the same time as the Kinder limited power of attorney, controlled the authority of Epstein. First, he points out that the spaces on the Bank standard form for the name of the attorney and his signature were left blank, in contrast to the Kinder form, which contained the attorney's name, albeit not his signature. The Bank's private banking officer witnessed both conflicting power of attorney documents without any discussion with Huber as to which one would control. Huber testified that he did not intend the Bank power of attorney to be the operative power of attorney, that no one at the bank told him it would be, and that as a German-speaker who needs an interpreter, he did not know that he was signing anything other than a standard account opening statement.

Second, Huber relies on the testimony of the Bank's Senior Operations Specialist, Regina Sullivan, designated pursuant to Fed. R.Civ.P. 30(b)(6), who explained that the Bank has a practice of obtaining a partially completed Bank form when presented with a non-Bank form, so that it has a document that fits in the Bank's 3″ X 5″ card file. Although the Bank's standard procedure required that the non-Bank power of attorney be attached to the signature card, according to Sullivan, most branches retain a separate file for the non-Bank power of attorney because of the size of the document as compared to the signature card files. The partially completed Bank power of attorney, which doesn't have the attorney listed was, in Sullivan's words, "an indication to any person looking at this that they need to go and look somewhere else." (Docket No. 268, ex. D, pp. 59:4–61:9) In her opinion, the "non Bank of Boston attorney would be the document that governs the power of attorney." (*Id.*) The Bank cited with approval this testimony in its opposition to the Rule 56.1 statement of plaintiff Gunter Huber when it admits "where there are both a non-Bank power of attorney and a Bank card power of attorney, *the non-Bank form governs.*" (Italics in original) (Docket No. 271, ex. 3, p. 6).

Now, the Bank insists there is a disputed issue of fact regarding the intent of the Bank in requiring Huber to sign an incomplete Bank form for the Power of Attorney. The testimony of Canice McGlynn, the former Marblehead branch manager, does not assist the bank on this issue. She testified that the Bank power of attorney was incomplete because it did not contain Epstein's name (although, she adds, maybe his name was understood) and that the Kinder power of attorney would not have been "taken into consideration". Because she had no answer to the question as to how any money left the Huber account pursuant to Epstein's directions, her testimony suggests that there were no operative power of attorney forms which gave Epstein any authority whatsoever. McGlynn's testimony is thin ice for the Bank to rest its case on, and the Bank has pointed to no other evidence that it intended a bank form power of attorney which was

incomplete in a critical respect—the name of the attorney—to trump the more limited Kinder power of attorney. Indeed, there is no evidence of any reliance whatsoever on this incomplete Bank document.

Huber argues that he is entitled to judgment under principles of apparent authority because the bank did not reasonably rely upon an incomplete Bank form in this circumstance as a manifestation by Huber of Epstein's unlimited authority concerning the authority of Epstein. He also relies on general rules of contract construction to support his argument that the more limited terms of the Kinder power of attorney trump the broader delegation of authority by the Bank power of attorney. *See Chelsea Indus., Inc. v. Florence,* 358 Mass. 50, 55–56, 260 N.E.2d 732 (1970) (holding that where two contracts were part of a single transaction, a court construing them must give weight to that circumstance); *Carrigg v. Cordeiro,* 26 Mass. App.Ct. 611, 617, 530 N.E.2d 809 (1988)(holding handwritten or typewritten terms inserted into a standard form agreement control over the "standard printed form" if the provisions conflict), *rev. denied,* 404 Mass. 1101, 536 N.E.2d 612 (1989) (Table); *In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1357 (1st Cir.1992) ("Separably negotiated or added terms are given greater weight than standardized terms or other terms not specifically negotiated.").[1]

Here, the undisputed testimony of the Bank's own employees is that the Bank follows a regular practice of construing the non Bank power of attorney as the operative document when the Bank power of attorney in the signature file does not include the name or signature of the attorney. Accordingly, after a careful perusal of the record to find more than a scintilla of evidence to support the Bank's position, I allow the motion for reconsideration on the ground that the document governing the authority of Epstein to withdraw funds from Huber's account is the Kinder power of attorney.

Finally, Huber argues that the Bank breached its deposit contract with Huber by failing to adhere to his explicit instruction to hold $3.5 million he had wired to the Bank until it received further instructions from him and is also liable for negligence. (Docket No. 299). With respect to Huber's request for supplemental findings regarding a negligence theory, I agree with the Bank this request is too late. I add that the request for supplemental findings on the contract claim is without merit. Even if the Bank violated Huber's dictate to hold his $3.5 million for further instructions from Huber, rather than deposit it into the account under his name, he later ratified the transaction by executing a backdated power of attorney to Epstein, as well as a signature card. Indeed, altogether he signed three power of attorney forms (two Kinder and one Bank). There is no evidence he challenged the Bank's deposit of his funds into his account, or the September 16 withdrawal.

### 3. *Kriesl*

Plaintiff Thomas Kriesl, one of the eleven named plaintiffs, has filed a motion for clarification of the court's order allowing his motion for summary judgment. (Docket No. 269). As a matter of oversight, I failed to include a statement of undisputed facts and legal discussion with respect to the Kriesl account. I do so now, drawing all inferences in favor of the non-moving party.

Kriesl is a German engaged in the business of management consulting. He lives in Germany. In the spring of 1993, he decided to invest in "prime bank guarantees" after discussions with Norbert Goebel and Uwe Schwabe of Pecunia, a business dealing in foreign currency trade. Goebel and Schwabe claimed to have traded in such investments. To make these investments, Kriesl sent monies to two separate accounts at the Bank.

#### a. *The First Account (August 5, 1993—October 12, 1993)*

On August 5, 1993, a personal checking account (no. 644–9983) was opened at the Bank's Marblehead branch in the name of plaintiff Steven Carter Corby ("Corby") or

---

1. The Bank in one of its last briefs has suggested that English law applies, but does not state how it differs from Massachusetts law on these issues of the authority of the agent or the construction of a contract where there are conflicting terms.

Marcus Beilacher ("Beilacher"), a German investor. The initial amount deposited was $145,000. The documents needed to operate this account were not signed until September 6, 1993 when Corby went to the Bank's London branch. There he executed a document entitled "Power of Attorney," which is substantially the same as the standard Kinder power of attorney.[2] However the "TO:" line is blank, and there is no specimen signature of attorney. London branch officer Stuart Paterson witnessed his signature. Corby also executed a signature card and Bank standard form of power of attorney, which *did* list Epstein as the person having the power of attorney. (Docket No. 168, Dep. Ex. 94.) Beilacher never executed a power of attorney or signature card for this account.

Kriesl deposited $466,135.07 into this account after being told by Schwabe and Goebel that this was an account established for him and Corby. Later, in a letter dated September 8, 1993 to the Bank, signed by Epstein, the Bank was advised of a name change on this account from Corby/Beilacher to Corby/Kriesl. The record does not indicate when the letter was received. There were two transfers out of this account. The Bank wire transferred $200,000 on September 8, 1993 to the account of attorney Gordon Rose at Santa Monica Bank at the instruction of Norman Epstein. On September 30, 1993, a further $6,500 was withdrawn from the account and deposited into an account in the name of Epstein's company, Kinder Capital at the Bank. On October 12, 1993, this account was closed. The remaining $260,-

**2.** The standard form reads:

To:
This power of attorney made this 6 day of Sept. 1993, by Steven J. Carter Corby of Newstead Mills, Newstead, Stamford, Lincolnshire (hereinafter called the "Customer").
Witness as follows:
The customer hereby appoints Kinder Capital, Inc. and/or Norman Epstein of Suite C2E, 400 Paradise Road, Swampscott, Massachusetts 01907 USA (hereinafter called "Attorney") to be the attorney of the customer to give instructions and take all actions in the name of the customer and on the customer's behalf required of the customer to operate the account.

105.09 was transferred into the second account no. 640–17836, discussed below.

b. *The Second Account (September 9, 1993—March 17, 1994)*

On September 9, 1993, the second personal checking account (No. 640–17936) was opened at the Bank's Marblehead branch in the name of Kriesl and Corby. It lists as the initial deposit $1.00. At the time this account was opened, Kriesl had not executed any Bank of Boston signature cards, account opening agreements or powers of attorney.

On September 24, 1993, Kriesl traveled to London where he signed an agreement with Kinder Capital to deposit at least $2,000,000 into an account at the Bank that was to be governed by a power of attorney in the name of Kinder Capital and/or Norman Epstein. He also executed a Kinder "power of attorney" to the Bank at the Bank's London Branch with language similar to the one executed for the Corby/Beilacher account. It was backdated to September 16, 1993. It contained no specimen attorney signature. A Bank private banking officer Darren Arman witnessed his signature on the power of attorney. While at the Bank, Corby and Kriesl executed signature cards and Bank forms of power of attorney relating to this account, which were also witnessed. The Bank power of attorney was blank with respect to the account number, and the name and signature of the proposed attorney. No attorney had signed the form. There were no discussions regarding the implications of simultaneously signing two different powers of attorney.

This account is solely for the buying and selling of prime bank instruments. This account at all time shall contain cash and/or prime bank instruments of credit, or invoices committing to deliver prime bank instruments of credit to a purchasing bank on behalf of in the fact amount of not less than the initial cash deposited. The purchasing bank shall be irrevocably instructed to remit payment for the letter of credit directly to client's bank account No. 644–99383 at bank of boston. Set out at the foot of this power of attorney is the specimen signature of the attorney.
In witness whereof the common seal of the customer was hereunto offered the day and year first written above.
Signed, sealed and delivered by:

After the initial transfer of $260,105.09 from the first account, Kriesl made the following deposits into this account: $609,600 on October 15, 1993; $209,970 on December 23, 1993; $454,180.18 on December 3, 1983; $580,500 on December 28, 1993; and $576,701.27 on February 18, 1994.

The Bank made the following wire transfers out of Kriesl's account at the instruction of Epstein: $166,134.07 on October 19; $650,000 on October 26; $20,000 on November 29, 1993; $240,000 on December 3, 1993; $20,000 on January 5, 1994; $450,000 on January 21, 1994; and $1,000,000 on March 2, 1994.

The Bank mailed all bank statements to the address of Kinder Capital in Swampscott Massachusetts, and not to the address of Corby or Kriesl. In a letter dated February 2, 1994, another bank employee Eileen Pasquerella listed deposits into the account, did not identify withdrawals and stated that "this account is being maintained in accordance with the documents on file, including the power of attorney to Norman Epstein, President of Kinder Capital, Inc." On March 17, 1994, upon discovering that most of the money had been withdrawn, Kriesl and Corby revoked the power of attorney and demanded that the Bank refund Kriesl's deposits. At that time, the account had a balance of $149,513.67. The bank has refunded the balance, plus interest, to Kriesl.

### c. *Legal discussion*

The legal analysis differs somewhat with respect to the two different accounts. With respect to the first account (no. 644–99383) Kriesl was not named as a co-signatory on the account at the time the $200,000 was wired to Gordon Rose on September 8, 1993. While Corby may assert a cause of action with respect to this unauthorized transfer of money, Kriesl does not. Corby's claim to the money is less clearcut because the Bank general power of attorney had Norman Epstein's name specified and the "to" line is blank on the Kinder power of attorney (Docket No. 168, Ex. 94). Accordingly, here the Bank reasonably relied on that general authority, as stated in my first opinion. Kriesl, though, was designated as a signatory at the time of the second transfer of $6,500.

As Kriesl concedes, however, this withdrawal left a balance in the account of $259,833.76. Because that amount is larger than the initial amount deposited, $145,000, the transfer was authorized under the Kinder power of attorney.

With respect to the second account (No. 640–17936), the first issue is whether the Kinder power of attorney trumps the Bank power of attorney, both of which were executed simultaneously in London. There is no factual distinction between the Huber and Kriesl circumstances. For the reasons stated above, based on the undisputed facts in the record, the Court concludes that the Kinder power of attorney was the operative document.

■ The second issue is the amount of the initial cash deposited in the Corby/Kriesl account. As both of the parties agree, this is significant because of the limitation in the "power of attorney" which states "this account at all times shall contain cash and/or prime bank instruments of credit, or invoices committing to deliver prime bank instruments of credit to a purchasing bank on behalf of Steven Carter Corby and Thomas Kriesl and in a value of not less than the initial cash deposited." (Docket No. 166, Ex. 106). I treat each account separately, as did the Kinder powers of attorney which specified separate account numbers. When the second account was opened on September 9, 1993, it listed the initial deposit as $1 .00. At that time, Corby and Kriesl were listed as customers, but neither had signed a power of attorney. After Kriesl signed the signature card and power of attorney, his initial cash deposit in the account was $260,105.09. The Bank argues that the initial deposit should be $1.00, the nominal amount used to open the account. To interpret the power of attorney as the Bank urges would render illusory and meaningless the protection given in the limited power of attorney. *McQuade v. Springfield Safe Deposit & Trust Co.,* 333 Mass. 229, 233, 129 N.E.2d 923 (1955) ("The rule of construction that a power of attorney must be strictly interpreted does not go to the extent of destroying the purpose of the power"). Given this construction, Kriesl has submitted a calculation that $1,670,000 is unau-

thorized. (Docket No. 281, Ex. B). The Bank has not disputed this figure.

### ORDER

I *ALLOW* the Bank's motion for reconsideration (Docket No. 263) with respect to Grabowski only. Otherwise, I deny it. I *ALLOW* Huber's motion for reconsideration (Docket No. 267). I *ALLOW* Kriesl's motion for summary judgment (Docket No. 269) in the amount of $1,670,000.