Lauren M. PAVLOVICH, Plaintiff,

v.

NATIONAL CITY BANK, Defendant.

No. 1:01 CV 1120.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 30, 2004.

Derek Kaesgen, David J. Hessler, Peter A. Hessler, Angela M. Privitera, Wegman, Hessler & Vanderburg, Cleveland, OH, for Plaintiff.

James P. Burke, Geoffrey J. Ritts, John M. Newman, Jr., Jones Day, Michael M. Hughes, Frantz Ward, William D. Beyer, Wuliger, Fadel & Beyer, Richard L. Stoper, Rotatori Bender Gragel Stoper Alexander, Cleveland, OH, W. Joe Wilson, William S. Fish, Jr., Tyler Cooper & Alcorn, LLP, Hartford, CT, for Defendant.

## ORDER

OLIVER, District Judge.

Lauren M. Pavlovich ("Plaintiff" or "Mrs. Pavlovich") instituted this action against National City Bank ("Defendant" or "NCB") on April 12, 2001, in the Cuyahoga County Court of Common Pleas. Defendant timely and properly removed the action to this court on May 8, 2001, based on federal question jurisdiction. Currently pending before the court are the parties' cross-motions for summary judgment. For the reasons set forth below, Defendant's Motion for Summary Judgment (ECF No. 66) is granted and Plaintiff's Motion for Partial Summary Judgment (ECF No. 70 (refiled as ECF No. 83)) is denied.

## I. FACTS

On December 8, 1992, Mrs. Pavlovich, under the supervision of Thomas M. Durkin ("Mr.Durkin"), President of Cashel Management Company ("Cashel"), an investment advisor under the 1940 Investment Advisors Act, signed an Investment Management Contract ("Cashel Contract") with Cashel at its offices in Cleveland, Ohio. Pursuant to the Cashel Contract, Cashel was to "formulate a specific investment strategy" and then to implement that strategy by "effect[ing] purchase and/or sale transactions of securities as agent"; additionally, Cashel was to have "complete discretion with respect to the investments of [her] funds and the execution of purchase and/or sale orders through one or more broker-dealers and/or registered representatives as [Cashel] deems appropriate." (Pl.'s Reply Mem. in Supp. of Pl.'s Mot. for Partial Summ. J., Ex. 4.) Because the Cashel Contract provided that Cashel was not to have custody of the funds and/or securities, Mrs. Pavlovich simultaneously executed a Custody Agreement ("Custody Agreement") with NCB. This Custody Agreement provided: "The Custodian shall have no duty to and shall not review or make investment recommendations with respect to any property held hereunder." (Pl.'s Mot. for Partial Summ. J., Ex. 1 at ¶ 5.) It also provided that "[t]he Custodian shall not be liable for the depreciation in value of any property held hereunder due to its compliance with any written direction." (Id. at ¶ 11.) The duties of the Custodian were to be largely administrative:

> The Custodian shall (a) follow for and collect all income and principal payments on the property; (b) perform the necessary clerical and bookkeeping services relative to the property; (c) advise [Mrs. Pavlovich] of all maturities, redemptions, exchanges, tenders, and shareholder rights and options; (d) send [Mrs. Pavlovich] a quarterly statement showing all receipts, disbursements, and other transactions and an annual priced inventory of the property; and (e) pay, deposit, or accumulate the net income and disburse the principal as [Mrs. Pavlovich] may direct in writing.

(Id. at ¶ 3.) Cashel was not a party to the Custody Agreement but acted as NCB's agent in obtaining Mrs. Pavlovich's execution thereof. Pursuant to the Custody Agreement, NCB was instructed that "The Custodian may safely rely and act upon any written direction delivered to it as provided herein, if purported to have been signed by me or by any one or more persons specifically authorized in writing by me and reasonably believed by the Custodian to be genuine." (Id. at ¶ 9.) Accordingly, Mrs. Pavlovich executed a letter ("Trading Letter") to Francis Dinda, an NCB Vice President and Trust Officer, instructing NCB that she was granting "sole trading authority" to Cashel.[1] (Pl.'s Mot. for Partial Summ. J., Ex. 2.)

---

1. Although Mrs. Pavlovich does not recall

signing this letter, (L. Pavlovich Dep. at 150),

On September 21, 1995, Cashel began investing Mrs. Pavlovich's money in Rx Remedy, a privately-held start-up company headquartered in Westport, Connecticut. The company was a healthcare information service and owned a large database of health care information. It published a magazine and sold information from its database to various parties in the medical field. Cashel directed NCB to disburse $250,000 from Mrs. Pavlovich's account (the "Account") and wire transfer that money to Rx Remedy's operating account at Chase Manhattan Bank in Westport, Connecticut. This money was for a stock investment in Rx Remedy; John Pavlovich ("Mr.Pavlovich") stated at deposition that he informed Mr. Durkin that Mrs. Pavlovich only wished to invest $100,000 in Rx Remedy stock and that she did not wish to invest any more funds in Rx Remedy. At the end of October 1995, Cashel deposited into the Account a refund check in the amount of $143,420; additionally, Mrs. Pavlovich received an Rx Remedy stock certificate in the mail which represented her $100,000 stock investment.

After two years of no transactions with Rx Remedy, Cashel again started investing Mrs. Pavlovich's money in Rx Remedy debt instruments and warrants. Typically, at the beginning of each month, Cashel requested money to be wired from the Account to Rx Remedy's account; then on the last day of the month, a Cashel representative would hand deliver to NCB a check in the amount of the earlier wire transfer plus "interest" for deposit into the Account. This pattern of transactions would begin again on the first day of the next month. The net effect of these repeated transactions was that even before the funds represented by the checks had been deposited into the Account, those same funds had already been wired back to Rx Remedy. Mr. Durkin named this pattern of transactions, "rollover transactions." Mrs. Pavlovich received at least 21 monthly statements from NCB; she never took any actions to indicate to NCB that she thought there was any problem. Mrs. Pavlovich also received statements from Cashel reflecting her investment in Rx Remedy notes and warrants as well as the interest that Rx Remedy was paying her. Finally, Mrs. Pavlovich received reports from Rx Remedy showing that it was losing money and that it depended on capital injections to sustain operations. It appears that Mrs. Pavlovich refused to fire Cashel or otherwise alter this series of investments, despite the increasingly apparent risks of not doing so, because she was convinced that Rx Remedy was going to be a "home run."

On February 20, 1999, the Tax Department of the Ohio Secretary of State's Office revoked Cashel's corporate charter with notice to Cashel; Cashel's charter was never reinstated.[2]

According to Mr. Pavlovich, during the summer of 1999 he confronted Mr. Durkin after he noticed that his wife's total account balance had dropped by approximately $200,000. Mr. Durkin explained that he had loaned the funds to Rx Remedy because that was the only way he could generate enough income on a monthly basis to meet the Pavlovichs' investment objectives without compromising their investment principal. Upon hearing this explanation, Mr. Pavlovich authorized Mr. Durkin to loan Rx Remedy a maxi-

---

this court will proceed on the assumption that the letter was, in fact, drafted and executed as argued by Plaintiff because, according to Mr. Dinda, that document would have been required in order to have opened the account in the first place. (F. Dinda Dep. at 32–34.)

2. Plaintiff does not put forward any evidence that NCB was aware of Ohio's revocation of Cashel's corporate charter.

mum of $300,000 in additional funds. Mrs. Pavlovich has presented no evidence that NCB was aware of this conversation which Mr. Pavlovich maintains he had with Mr. Durkin in that regard.

In December 1999, however, $505,000 was transferred from the Account to Rx Remedy and at the end of the month, $505,498 was deposited back into the Account. Mr. Pavlovich has testified that he received the December statement and called NCB in January to complain. NCB denies that this call ever took place. Mr. Pavlovich states that during this conversation he learned of similar transactions that took place in January 2000 and that he demanded that the money be returned to his wife's Account. He further states that he told someone at NCB that "these transfers are not supposed to happen." (J. Pavlovich Dep. at 114.) A few days later, the money that was transferred out of the Account on January 3, 2000, was returned. Also in January 2000, according to Mr. Durkin, an employee at NCB informed him that NCB would be implementing a "five day rule" from that point forward. Under the five day rule, NCB would not approve any wire transfers from Cashel which were dependent on funds that had been deposited by check less than five days earlier. There is no evidence that NCB ever breached this five-day rule or that the rule was to be interpreted to prevent NCB from ever making transfers of money to Rx Remedy. In October 2000, Cashel again requested big wire transfers from the Account to Rx Remedy, two of which exceeded the available cash balance in the Account. At the end of the month, Rx Remedy made a deposit back into the Account, slightly exceeding the total amount transferred out of the Account.

In October 2000, Cashel again ordered money transfers out of the Account back to Rx Remedy. When Mr. Pavlovich received his wife's October 2000 statement in November, he noticed the big transfers of money. On November 16, 2000, Rx Remedy sent a check for deposit into the Account in the amount of $2,090,000; on the same day, however, Rx Remedy ordered its bank to "Stop Payment" on the check. Days later, NCB informed the Pavlovichs that the check was not honored. On or about November 16, 2000, Mrs. Pavlovich sent a letter to NCB withdrawing Cashel's authority over the custody account. On November 20 and 21, 2000, Rx Remedy wired a total of $650,000 to the Account. However, Rx Remedy filed for bankruptcy on December 20, 2000, and this transfer was claimed by the trustee to be a preference; eventually, Mrs. Pavlovich had to return $176,962.02 of the $650,000 to the trustee.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for sum-

mary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.,* 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will

bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

### III. LAW AND ANALYSIS

Defendant moves for summary judgment on five counts in Plaintiff's Complaint: (1) Breach of Contract (Count I); (2) Breach of Fiduciary Duty (Count II); (3) Unauthorized Wire Transfers (Count III); (4) Negligence (Count IV); and (5) Aiding and Abetting (Count VII).

#### A. Defendants' Motion for Summary Judgment

##### 1. Breach of Contract (Count I)

Defendant moves for summary judgment as to Count I of Plaintiff's Complaint, breach of contract. Defendant argues that it acted pursuant to its contract between itself and Mrs. Pavlovich because it was following written instructions from Mrs. Pavlovich's agent, Cashel. Plaintiff argues that NCB breached the Custody Agreement because it allowed Cashel to direct money to Rx Remedy despite the fact that Cashel did not have unlimited authority over the funds in her Account.

If a contract's terms are clear and unambiguous, a court may grant summary judgment since contract interpretation is a matter of law. *See Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 714 N.E.2d 898, 901 (1999); *Crowther v. Holtkamp*, 1994 WL 189500, *5, 1994 Ohio App. LEXIS 2082, *13 (Ohio App. May 12, 1994). In order to prevail on its breach of contract claim, Plaintiff must show that a contract existed, the Plaintiff performed, Defendant breached it, and that Plaintiff suffered damages or loss. *Wauseon Plaza, Ltd. P'ship v. Wauseon Hardware Co.*, 156 Ohio App.3d 575, 807 N.E.2d 953, 957 (2004). In this case, there is no dispute as to whether a contract—here, the Custody Agreement—existed; the main issue, then, is to determine whether NCB breached the Custody Agreement.

The Custody Agreement was very clear in what it authorized: "The Custodian may safely rely and act upon any written direction delivered to it as provided herein, if purported to have been signed by me or by any one or more persons specifically authorized in writing by me and reasonably believed by the Custodian to be genuine." (Pl.'s Mot. for Partial Summ. J., Ex. 1 at ¶ 9.) The authority for Cashel to act on behalf of Mrs. Pavlovich was laid out in the Trading Letter which granted "sole trading authority" to Cashel. (Pl.'s Mot. for Partial Summ. J., Ex. 2.) It is not in dispute that all of Cashel's orders to NCB were in writing. Therefore, NCB was merely abiding by the terms of the Custody Agreement in executing the orders placed by Cashel. In *Yochim v. First of America Bank–Michigan N.A.*, 1994 WL 791186, 1994 U.S. Dist. LEXIS 19728, (E.D.Mich. Dec. 16, 1994), the court wrote that even where there was "obvious self dealing," *id.* at *8, 1994 U.S. Dist. LEXIS 19728 at *25, the bank was "authorized to act on instructions of [the agent] it believed were genuinely made on behalf of

clients." *Id.* The court concluded that no breach of contract occurred and granted summary judgment as to that claim. *Id.* at *8, 1994 U.S. Dist. LEXIS 19728 at *25–26. In this case, there is no evidence that NCB did not genuinely believe that the directions from Cashel were made on behalf of Mrs. Pavlovich. As such, NCB was merely abiding by the specific terms of the Custody Agreement in executing the trades ordered by Cashel.

Furthermore, as described above, the Custody Agreement explicitly relieved NCB of any duty to review the investments Cashel made. (Pl.'s Mot. for Partial Summ. J., Ex. 1 at ¶ 5.) Case law indicates that such clauses in custody agreements are fully enforceable. *See, e.g., Abbott v. Chem. Trust*, 2001 WL 492388, *10, 2001 U.S. Dist. LEXIS 6214, *47 (D.Kan. Apr. 26, 2001); *Kaiser v. First Hawaiian Bank*, 30 F.Supp.2d 1255, 1262 (D.Haw. 1997). Thus, NCB was contractually bound not to make any judgment as to the appropriateness of any of the investments Cashel made with Mrs. Pavlovich's money. Accordingly, NCB cannot be held liable for abiding by the terms of the Custody Agreement and failing to prevent the "rollover transactions" ordered by Cashel.

Therefore, this court finds that the Custody Agreement was "clear and unambiguous" in what it required of NCB. NCB did not breach the contract by executing the trades ordered by Cashel, Mrs. Pavlovich's authorized agent. Thus, there was no breach of contract.

### a. Trading Letter

Mrs. Pavlovich argues that the Trading Letter limited the authority of Cashel to control her money and obligated NCB to reject Cashel's written directions because the Trading Letter specified that Cashel's only authority over the Custody Account was to provide NCB with a list of brokerage firms from whom to accept trades.

This argument is not well-taken. As recounted above, the terms of the Cashel Contract were unambiguous in granting Cashel "complete discretion" over Plaintiff's money. Similarly, the evidence indicates that Mrs. Pavlovich understood how broad the Cashel Contract's language was, with respect to Cashel's power to control her money. (*See* L. Pavlovich Dep. at 103–05.) The Supreme Court of Ohio has held repeatedly that, "Express authority is that authority which is directly granted to or conferred upon the agent or employee in express terms by the principal, and it extends only to such powers as the principal gives the agent in direct terms; and the express provisions are controlling where the agency is expressly conferred." *Columbus City Sch. Dist. Bd. of Educ. v. Zaino*, 90 Ohio St.3d 496, 739 N.E.2d 783, 786 (2001) (quotations omitted). Thus, this court looks to the primary document conferring agency authority to Cashel to determine the scope of Cashel's authority. In so doing, this court finds both the language in the Cashel Contract and Mrs. Pavlovich's understanding of that language to be unequivocal. For example, Mrs. Pavlovich admitted during deposition that NCB could rely on *any* instructions from Cashel:

> Q: You agreed that National City Bank could safely rely and act upon any written direction from Cashel?
>
> A: Yes.

(L. Pavlovich Dep. at 125–26.) In short, NCB was under no obligation to question or inquire into the directions submitted by Cashel, Mrs. Pavlovich's investment agent, and had no reason to think that the authority was circumscribed by the Trading Letter.

Plaintiff argues that the investments in Rx Remedy were not "trades," but rather disbursements of principal, and that NCB therefore violated the terms of the Trading Letter when it wired the money from the Account to Rx Remedy. In light of this court's determination that the Trading Letter did not limit the authority conferred upon Cashel to direct the investment of Mrs. Pavlovich's money, it need not directly address this additional argument. However, this court refers to the accepted definition of the word "trade" as "the business of buying and selling for money." *May v. Sloan*, 101 U.S. 231, 237, 25 L.Ed. 797 (1879); *see also* Black's Law Dictionary 1492 (6th ed.1990). This seems to include the purchase of Rx Remedy notes in exchange for a promise to repay the principal plus 12% interest, despite the fact that the notes were never represented by pieces of paper. Regardless, the discussion of ratification, *infra* § III.A.1.b., is relevant because Mrs. Pavlovich never once complained about the lack of paper during the many years that Cashel directed her money towards Rx Remedy, of which she was made aware by the monthly statements; furthermore, Mrs. Pavlovich was aware and approved of the fact that the notes paid 12% interest.

Therefore, this court concludes that the Trading Letter does not override the authority of the Custody Agreement.

#### b. Ratification

█ Even if the Trading Letter did circumscribe Cashel's authority to give NCB orders, Mrs. Pavlovich ratified the actions of Cashel by accepting its actions and their consequences over the course of several years. "Ratification may be implied when there is actual knowledge of an agreement, acceptance of its benefits and a failure to repudiate within a reasonable time." *Young v. Int'l Bhd. of Locomotive Engineers*, 114 Ohio App.3d 499, 683 N.E.2d 420, 425 (1996). Mrs. Pavlovich granted express agency authority to Cashel via the Cashel Contract signed in 1992. (Pl.'s Reply Mem. in Supp. of Pl.'s Mot. for Partial Summ. J., Ex. 4. ("[Cashel] will effect pur-

chase and/or sale transactions of securities as agent for you.").) Over the years, Cashel exercised complete control over Mrs. Pavlovich's investments and starting in 1995, Cashel invested Plaintiff's money in Rx Remedy. Each month, NCB and Rx Remedy sent statements to Mrs. Pavlovich detailing the Account activity initiated by Cashel. (*See* L. Pavlovich Dep. at 145–47, 197–205, 246–51.) Not once did she either object to these transactions or contact NCB in order to question any of the information the statements reported.[3]

Furthermore, Mr. Pavlovich has testified that he spoke with Mr. Durkin during the summer of 1999 and asked him to *increase* his wife's investments in Rx Remedy. (J. Pavlovich Dep. at 92–93.) Finally, Mrs. Pavlovich accepted the benefits of allowing Cashel to invest her money in Rx Remedy notes by accepting the interest the notes paid, *see* L. Pavlovich Dep. at 201, and reporting the interest as income on her annual tax returns. This court finds that this behavior by Mrs. Pavlovich demonstrates that she ratified the actions of her agent and so cannot now claim that her agent acted without her consent.

The Third Circuit has held that

[a] depositor sustains such relation to his bank that he is bound to give heed to its periodical statements showing the transactions of his account. Out of this relation there has grown a rule of law which requires a depositor in a bank to examine, personally or by an authorized agent, and with due diligence, . . . the bank's periodical statements showing credits and debits . . . and to report to the bank without unreasonable delay any errors he may discover. Otherwise the bank may regard his silence as an admission that the entries as shown are correct.

*First Nat'l Bank v. Farrell,* 272 F. 371, 376 (3d Cir.1921); *see also White Castle System, Inc. v. Huntington Nat'l Bank,* 43 N.E.2d 737, 741, 1941 Ohio App. LEXIS 1018, *16 (Ohio App.1941) ("Where it is the custom of the bank, and known to the customer as in the instant case, for the bank to send out statements at certain intervals, it is the duty of the customer to examine such statements and reconcile the same with their own books, and if there is a variance report the error within a reasonable time."). Other courts have held that this principle precludes recovery from the bank by plaintiffs who later dispute certain transactions. For example, in *V.H. Juerling & Sons, Inc. v. First National Bank,* 143 Ind.App. 671, 242 N.E.2d 111 (1968), the court affirmed summary judgment for the defendant banks and held:

The record in this case shows that the Appellant did not examine its checks to determine whether the balance was correct, or whether all the canceled checks

---

**3.** For example, consider the following deposition testimony of Mrs. Pavlovich:

> Q: [A]fter you opened your personal custody account at National City Bank, you received a statement on that account each month[ ]; is that correct?
> A: Yes.
> Q: Did you read the statements?
> A: Yes.
> . . .
> Q: [D]id you ever have any communications with anybody at National City Bank regarding any of the transactions on your statements?
> A: I personally did not.
> Q: Did you ever call National City Bank to object to any of the transactions on your statements?
> A: I did not.
> Q: Did you ever call to inform National City Bank that any of the transactions on your statements were unauthorized?
> A: I did not.
> Q: Did you ever tell anybody at National City Bank that transactions with Rx Remedy were unauthorized?
> A: I did not.

L. Pavlovich Dep. at 145–47.

were present, or whether any of the canceled checks were forged. Therefore, we must hold as a matter of law, that by the failure of the appellant to make such an examination of the bank statements every month, the appellant was guilty of such negligence as to amount to a ratification of the banks' actions in paying the forged checks and to preclude the appellant's recovery from the banks. We think the cases clearly hold the depositor liable for his failure to examine the statements furnished to him by the bank, so that if he fails to make such an examination within a reasonable time, and fails to notify the bank of any irregularities he then acquieses [sic] in the bank's conduct and confirms its action.

*Id.* at 119–120. At any point after 1995, when the investments in Rx Remedy began, Mrs. Pavlovich could have directed NCB to stop making deposits or wire transfers to Rx Remedy or she could have revoked her authorization of Cashel's conduct. That she did not lend weight to this court's determination that she acquiesced in and confirmed NCB's execution of Cashel's orders thereby ratifying the actions of her agent. Thus, she is not now entitled to object to those very actions.

Plaintiff has argued that she could not have ratified the transactions since she did not have "full knowledge of the material facts." *Wilson v. Forder*, 20 Ohio St. 89, 97, 1870 Ohio LEXIS 79, *6 (1870). The court disagrees. The cases that have applied *Wilson's* rule are distinguishable from the instant case. In *Huntington National Bank v. Kraft*, 1986 WL 7881, 1986 Ohio App. LEXIS 7647 (July 15, 1986), the court held that there was insufficient knowledge when the principal was essentially coerced into signing a document because she was "vulnerabl[e]" to the "strong suggestions" of her husband who was essentially acting as her attorney. *Id.* at *3, 1986 Ohio App. LEXIS 7647 at *7. In

*Market Mohawk Medical and Professional Center v. H.F. Properties*, 1977 Ohio App. LEXIS 8141 (Nov. 8, 1977), the court held that mere benefit was not enough to demonstrate "full knowledge." *Id.* at *16–17. In the instant case, Mrs. Pavlovich was not coerced into signing anything and she did not "merely" benefit. Instead, she received monthly statements, explicitly detailing the inflows and outflows of cash. She knew that she was receiving interest from her loans to Rx Remedy. (L. Pavlovich Dep. at 258–59.) Her husband requested that her loans be increased so as to maximize her returns on these investments. (J. Pavlovich Dep. at 91–94.) Additionally, she knew of the risk in investing in private companies like Rx Remedy:

Q: When you bought your stock in Rx Remedy, you understood that there was a risk of a loss of your investment?

A: Yes.

Q: That's the case of any investment in a private company, correct?

A: Or public.

Q: Or public company?

A: Yes.

. . .

Q: When you bought Rx Remedy stock, you willingly assumed the risk of that investment, correct?

A: Yes.

Q: You were trying to make a profit on that investment, correct?

A: Yes.

Q: You thought that there might be benefits from being an early investor in the company, correct?

A: Yes.

Q: You thought that if Rx Remedy was successful, the value of the shares that you bought might increase?

A: Yes.

Q: You thought that if Rx Remedy went public, that you might be able to sell your shares for a substantial profit?

A: Yes.

Q: You agreed to assume the risk of investing in a private company in hopes of getting high returns later, correct?

A: Correct.

(L. Pavlovich Dep. at 161–63) (objections omitted). Consequently, all of the facts indicate to this court that Mrs. Pavlovich did have "full knowledge" of the material facts sufficient to have ratified the agent's authority to transact business on her behalf.

This court therefore finds that Mrs. Pavlovich ratified all of the actions by her agent at least up until January 2000.

### c. January 2000 Conversation

Mr. Pavlovich testified to having a conversation in January 2000 with an employee at NCB, Ms. Moore, during which he told her "these transfers are not supposed to happen." (J. Pavlovich Dep. at 114.) No record exists of this conversation and Ms. Moore denies ever having had it. (A. Moore Dep. at 178–182–83; D. Wheeler Dep. at 135, 137.) For purposes of summary judgment, however, this court must construe all facts in a light most favorable to the non-moving party, here Mrs. Pavlovich.

Even construing the facts favorably towards Mrs. Pavlovich, the conversation does not undermine Mrs. Pavlovich's ratification of the Rx Remedy transactions. Mr. Pavlovich never elaborated on what he meant by "these transfers" and further stated that he cannot remember the exact words he used during the conversation. (J. Pavlovich Dep. at 115.) Mr. Pavlovich did not clarify whether his concerns were related to the frequency of the transfers, Cashel's authority to invest Mrs. Pavlo-

vich's money, Cashel's investment strategy, or some other aspect of the transactions. What is most important is what Mr. Pavlovich does *not* claim to have told NCB in the alleged conversation. Mr. Pavlovich does not assert that he instructed NCB to reject any transfers to or from Rx Remedy, or to reject any Rx Remedy stock. Mr. Pavlovich does not assert that he instructed NCB to reject any investment instructions from Cashel. In short, there is no evidence that NCB knew what Mr. Pavlovich meant by "these transfers" such that it could have interpreted that statement as indicating Mrs. Pavlovich's unwillingness to continue to allow Cashel to have control over her money.

Furthermore, the terms of the Custody Agreement are explicit in not requiring NCB to have taken any action regarding the orders given in the conversation. First, Mr. Pavlovich was *not* a party to the Cashel Contract and was never given *any* authority over the account by Mrs. Pavlovich. Second, there was no *written* instruction from Mrs. Pavlovich, as required by the Custody Agreement, affecting Cashel's authority. (Pl.'s Mot. for Partial Summ. J., Ex. 1 at ¶ 9. "The Custodian may safely rely and act upon any written direction delivered to it as provided herein, if purported to have been signed by me or by any one or more persons specifically authorized in writing by me and reasonably believed by the Custodian to be genuine.") There was not even any written instruction from Mr. Pavlovich, although such instruction would still not abide by the terms of the Custody Agreement that required Mrs. Pavlovich to make the writing.

Therefore, this court concludes that the ratification of Cashel's actions includes all of the Rx Remedy transactions at least up until January 2000. Further, even if the January 2000 conversation did take place

as Mr. Pavlovich said it did, the directive given by Mr. Pavlovich to NCB was not sufficiently clear to indicate to NCB the exact transactions to which he was objecting. Mr. Pavlovich himself is vague as to the exact directions he gave to NCB on the day he made that phone call. Therefore, this court concludes that the January 2000 phone call does is not sufficient to negate Mrs. Pavlovich's ratification of any Rx Remedy transactions.

### d. Uniform Fiduciary Act

NCB also argues that it is protected by the Uniform Fiduciary Act ("UFA") from liability under these circumstances. Ohio has adopted the UFA, the relevant provision of which states:

> If a check is drawn upon his principal's account by a fiduciary who is empowered to do so, the bank may pay such check without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing such check or with knowledge of such facts that its action in paying the check amounts to bad faith.

Rev.Code § 1339.09. The UFA amounts to a shield from liability when a bank accepts instructions from a customer's fiduciary who has authority to transact the business in question. *Master Chem. Corp. v. Inkrott*, 55 Ohio St.3d 23, 563 N.E.2d 26, 30 (1990). First, this court finds that Cashel was Mrs. Pavlovich's fiduciary insofar as it was her agent. Rev.Code § 1339.03(B). Second, this court finds that Cashel was "empowered" to draw upon its principal's account, via the authority granted to it in the Cashel Contract.

Third, there is insufficient evidence to prove that NCB had "actual knowledge" that the fiduciary was committing a breach of its obligation. To the extent that the Cashel Contract circumscribed Cashel's authority over Mrs. Pavlovich's money, NCB had no way of knowing because Mrs.

Pavlovich never informed NCB of any of these limitations, *see* L. Pavlovich Dep. at 130–31, and as mentioned above, Mrs. Pavlovich never objected to the transactions despite having full knowledge of them. As for Mr. Pavlovich's call to NCB in January 2000, as noted above, this court finds that Mr. Pavlovich's directive was too vague to have made NCB aware that Cashel was breaching its obligation; furthermore, Mr. Pavlovich was not named in the Account and, therefore, did not speak for Mrs. Pavlovich. Therefore, this court's finding of the applicability of the UFA extends to all transactions ordered by Cashel, not merely the transactions that occurred prior to December 1999.

Finally, there is insufficient evidence to conclude that NCB acted in bad faith. The Ohio Supreme Court has held that bad faith is determined by examining "whether it was 'commercially' unjustifiable for the payee to disregard and refuse to learn facts readily available. The facts and circumstances must be so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." *Inkrott*, 563 N.E.2d at 31 (citations omitted). This is a high standard for the Plaintiff to meet and she has not done so. The only fact to which she can point that suggests bad faith is NCB's ignorance of the details of the "rollover transactions." However, Ohio courts have held that even ignorance in light of "suspicious circumstances" is not enough to trigger bad faith.

> The distinction between bad faith and negligence is that, unlike negligence, bad faith is willful. The mere failure to make inquiry, even though there be suspicious circumstances, does not constitute bad faith, unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that

inquiry would disclose a vice or defect in the transaction—that is to say, where there is an intentional closing of the eyes or stopping of the ears.

*Nations Title Ins. v. Bertram*, 140 Ohio App.3d 157, 746 N.E.2d 1145, 1151 (2000) (citations and quotations omitted). Here, there is no evidence that NCB's actions were willful. Although Mr. Durkin claims that NCB instituted a "five-day rule" pursuant to which checks from Rx Remedy to the custody accounts were not fully credited until five days after they were presented for deposit, Plaintiff puts forward no evidence to suggest that this action was taken in order to prevent the "rollover transactions" or other wrongdoing by Cashel. In fact, nothing suggests that NCB did not comply with the directives of the Custody Agreement that stated clearly, "The Custodian shall have no duty to and shall not review or make investment recommendations with respect to any property held hereunder." (Pl.'s Mot. for Partial Summ. J., Ex. 1 at ¶ 5.)

Therefore, this court concludes that NCB did not act in bad faith and does not fall into the statutory exceptions to the UFA. Therefore, NCB is shielded from liability for following the written instructions of Mrs. Pavlovich's fiduciary, Cashel.

### e. Conclusion

This court thus finds that NCB did not breach the Custody Agreement because the terms of the contract clearly and unambiguously authorized NCB's actions. Accordingly, as to Count I of Plaintiff's Complaint, breach of contract, Defendant's Motion for Summary Judgment is granted.

### 2. Breach of Fiduciary Duty (Count II)

Defendant moves for summary judgment as to Count II of Plaintiff's Complaint, breach of fiduciary duty. Defendant argues that there was no fiduciary relationship created between Mrs. Pavlovich and NCB upon execution of the Custody Agreement. Plaintiff argues that NCB owed her the duties of a fiduciary beyond the duties required by the Custody Agreement.

The type of account Mrs. Pavlovich had with NCB was a non-discretionary account, an account pursuant to which the bank or broker has no authority over how the funds in the account are disbursed. Relevant case law indicates that a fiduciary relationship pursuant to a non-discretionary account exists only to the extent of carrying out transactions requested by the account-holder. The Sixth Circuit has held that "[a]lthough a broker operating a discretionary account—in which the broker determines which investments to make—is viewed as a fiduciary[,] it is generally accepted that no fiduciary duty arises between a broker and his client in relation to a non-discretionary commodity trading account." *J.C. Bradford Futures, Inc. v. Dahlonega Mint, Inc.*, 1990 WL 95625, *5, 1990 U.S.App. LEXIS 11787, *17 (6th Cir. July 11, 1990) (quotations and citations omitted); *see also Martinez Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 412 (5th Cir.1998)(where an investor controls a nondiscretionary account and retains the ability to make investment decisions, the scope of any duties owed by broker will generally be confined to executing investor's orders); *Hill v. Bache Halsey Stuart Shields Inc.*, 790 F.2d 817, 824 (10th Cir.1986) (where a broker's duties with respect to nondiscretionary account were limited to executing orders, the fiduciary duty owed would be very narrow—"primarily not to make unauthorized trades").

■ Here, NCB did not have any discretion over Mrs. Pavlovich's money—indeed, the Custody Agreement explicitly states this. *See supra.* Therefore, NCB was much like a broker executing orders given by the account holder. Its only duty

was to execute the written orders it received from Mrs. Pavlovich or her designated agent. Other cases have held similarly. For example, in *Abbott v. Chemical Trust,* 2001 WL 492388, 2001 U.S. Dist. LEXIS 6214 (D.Kan. Apr. 26, 2001), the court held that custody accounts that disclaimed responsibility for choosing investments were to be treated as if no fiduciary responsibility existed outside the bounds of the contract. *Id.* at *8, 2001 U.S. Dist. LEXIS 6214 at *40–41. In *Abbott,* the custodial agreement clearly stated that the defendant had

> no responsibility or involvement in evaluating or selecting any assets for disposition, and shall have no liability for any loss or damages that may result from or be associated with any requested investment transaction.... [Defendant] assume[s] no responsibility for rendering investment advice with respect to your IRA, nor will we offer any opinion or judgment to you on matters concerning the value or suitability of any investment or proposed investment for your IRA.

*Id.* at *7, 2001 U.S. Dist. LEXIS 6214 at *38. The law in Ohio is to the same effect:

> An agency relationship imposes a fiduciary duty upon the agent to act in good faith and loyalty on behalf of his principal. However, the fact that this contract created an agency relationship between [the parties] did not, without more, impose a fiduciary duty upon [agent] which was separate from, and in addition to, that imposed on it by the contract.

*Gem Sav. Ass'n v. Sterling Gold Properties, Ltd.,* 1992 WL 245999, *6, 1992 Ohio App. LEXIS 4965, *16 (Oct. 2, 1992). Consequently, the language in the Custody Agreement does not create a fiduciary duty. Thus, this court finds that NCB did not owe Mrs. Pavlovich a fiduciary duty and did not owe any duties beyond those made explicit in the Custody Agreement.

Accordingly, this court grants Defendant's Motion for Summary Judgment on Count II of Plaintiff's Complaint, breach of fiduciary duty.

### 3. Unauthorized Wire Transfers (Count III)

Defendant moves for summary judgment as to Count III of Plaintiff's Complaint, unauthorized wire transfers. Defendant argues that it was authorized to execute wire transfer orders from Mrs. Pavlovich's agent, Cashel. Plaintiff argues that she never authorized Cashel to order the wire transfers and that NCB is therefore liable under Uniform Commercial Code ("UCC") Article 4A–204, codified as Ohio Rev.Code § 1304.59(A), entitled "Refund of payment and duty of customer to report with respect to unauthorized payment order," [4] and case law interpreting this section.

■■■■ Ohio has adopted UCC 4A–202, "Authorized and verified payment orders," codified as Ohio Rev.Code § 1304.57(A). It provides: "A payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency." *Id.* Additionally, the express language of § 1304.59(A) carves out an exception for payment orders "effective as the order of

---

4. Section 1304.59(A) provides, in part:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is not authorized and not effective as the order of the customer under section 1304.57 of the Revised Code, or not enforceable ... the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund.
>
> Rev.Code. § 1304.59(A).

the customer under section 1304.57." Rev. Code § 1304.59(A). Therefore, NCB cannot be held liable if the sender—Cashel—was an authorized agent. As this court held above, Cashel was Mrs. Pavlovich's agent for purposes of investing her money and NCB was entitled to rely on written instructions coming from Cashel. Similarly, to the extent that the Trading Letter might be viewed as limiting Cashel's authority, Mrs. Pavlovich ratified all of Cashel's actions by having failed to object after she had notice of those actions. Plaintiff argues again that a principal cannot ratify an agent's acts unless it can be shown that the principal had knowledge of all the facts pertaining to the act. As explained above, this court finds that there is no genuine dispute that Plaintiff *did* have knowledge of all the facts. Plaintiff argues that because NCB was not privy to the Cashel Contract, NCB therefore could not accept the wire transfer instructions from Cashel as it acted as Mrs. Pavlovich's agent. This argument is not well-taken. The law is clear that an agent's authority stems from its contract with the principal, *Zaino*, 739 N.E.2d at 786, and does not depend on whether the third party has seen the contract.

Finally, not only did Mrs. Pavlovich fail to object to the transactions, the record indicates that she expected and approved of the relationship between Cashel and NCB such that NCB was to follow *any* written direction from Cashel. (L. Pavlovich Dep. at 125–56.) Therefore, Plaintiff may not now argue that NCB should have known that Cashel's power of agency was circumscribed in any way. Pursuant to the Custody Agreement, NCB was to rely on the continuance of any agency authorization until "notified in writing to the contrary." (Pl.'s Mot. for Partial Summ. J.,

Ex. 1 at ¶ 9.) Mrs. Pavlovich did not notify NCB that she was revoking Cashel's authority until November 16, 2000—at which point NCB complied—and prior to that date she never considered sending a letter to NCB revoking Cashel's authority. (L. Pavlovich Dep. at 388.)

Plaintiff cites to *Grabowski v. Bank of Boston*, 997 F.Supp. 111 (D.Mass.1997),[5] for the proposition that NCB should have been able to determine that the agent Cashel was exceeding its authority and, thus, conducting unauthorized transactions. This court disagrees. The *Grabowski* court recognized that in order to determine whether there had been an unauthorized wire transfer, it first had to

> determine the scope and validity of the contract between the plaintiffs and the Bank concerning the extent of the authority granted to Epstein [third party defendant] to operate their accounts. In essence, the Court must determine the nature of the contract between the plaintiffs and the Bank and whether the Bank breached its contractual duties under that contract by permitting Epstein to withdraw their funds from the Bank of Boston accounts.

*Id.* at 124. This court has already performed this analysis, *supra* § III.A.1., finding that NCB did not breach its contract with Mrs. Pavlovich because Cashel had unlimited authority over Mrs. Pavlovich's money and that NCB was entitled to rely on that authority. The *Grabowski* court writes, "If Epstein had general authority over the account, the Bank is not liable for" his unauthorized withdrawals. *Id.* Here, Cashel *had* general authority over Mrs. Pavlovich's Account and, thus, NCB is not liable for Cashel's unauthorized wire transfers.

---

**5.** Although this case is captioned "Crabowski," the lead plaintiff is actually named "Grabowski" and the text of the decision as well as

a subsequent case—*Grabowski v. Bank of Boston,* 997 F.Supp. 130 (D.Mass.1998)—refer to the plaintiff by the correct spelling.

The discussion above relating to the Trading Letter's purported limitations on Cashel's authority is relevant here as well. This court looks to the primary document conferring agency authority to Cashel—the Cashel Contract—to determine the scope of Cashel's authority. In so doing, this court finds both the language in the Cashel Contract and Mrs. Pavlovich's understanding of that language to be unequivocal and unlimited. Finally, as noted above, Mr. Pavlovich's assertions that he called NCB in January 2000 and told it to stop making wire transfers to Rx Remedy are not relevant because Mr. Pavlovich did not have such authority over Mrs. Pavlovich's Account and the purported order was oral. This was inconsistent with the terms of the Custody Agreement which required any revocation of agency to be in writing. Therefore, "notice" as required by the statute, first occurred not in January 2000 but in November 2000 when Mrs. Pavlovich finally objected to the wire transfers by revoking Cashel's agency authority.

For the reasons stated above, this court finds that NCB did not engage in unauthorized wire transfers in contravention of Ohio law. Therefore, as to Count III of Plaintiff's Complaint, unauthorized wire transfers, Defendant's Motion for Summary Judgment is granted.

### 4. Negligence (Count IV)

Defendant moves for summary judgment as to Count IV of Plaintiff's Complaint, negligence. Defendant argues that no such cause of action exists when the relationship between the parties has been reduced to a contract and in the alternative that Plaintiff cannot prove that NCB breached a duty of care. Plaintiff argues that her damages were not purely economic but constituted damage to her "property" and that NCB owed her an independent duty of care, outside of Custody Agreement.

### a. Economic Loss Rule

In general, under Ohio law, the "economic loss" rule provides that there is no cause of action in negligence for claims arising under a contract. In the seminal case on this matter, *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.,* 42 Ohio St.3d 40, 537 N.E.2d 624 (1989), the Supreme Court of Ohio held that "[t]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Id.* at 630 (quotations omitted). When parties reduce their relationship and obligations to a written contract, there is generally no independent duty of care. Consequently, "when the promisee's injury consists merely of the loss of his bargain, no tort claim arises because the duty of the promisor to fulfill the term of the bargain arises only from the contract." *Id.* at 631 (quotations omitted).

Plaintiff argues that contrary case law indicates that the economic loss rule is inapplicable under these facts. In *Mead Corp. v. ABB Power Generation, Inc.,* 319 F.3d 790 (6th Cir.2003), the Sixth Circuit, applying Ohio law, held that "accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract." *Id.* at 795 (quoting *Hunsicker v. Buckeye Union Cas. Co.,* 95 Ohio App. 241, 118 N.E.2d 922, 924 (1953)). However, this court reads *Mead* as pertaining solely to the performance of the terms of the contract. In other words, the duty of care is not independent of the contract—the duty's extent and scope are governed by the relevant document. Therefore, the negligent failure to observe care, skill, reasonable expedience, and

faithfulness in the performance of a contract is an *alternative* to breach of contract, not a unique and independent cause of action.

■ With those principles in mind, this court finds that the economic loss doctrine applies to Plaintiff's negligence cause of action and that there was no independent duty of care that NCB owed to Mrs. Pavlovich. First, this court views Mrs. Pavlovich's losses as purely economic, despite her attempt to characterize the losses as "property damages." "Property damages," when the property in question is money in a bank account, are regarded as economic losses. "[T]he law of negligence does not extend the [defendant]'s duty so far as to protect the consumer's economic expectations, for such protection would arise not under the law but rather solely by agreement between the parties." *Chemtrol*, 537 N.E.2d at 630–31. Therefore, because Mrs. Pavlovich's damages are purely economic and governed by the terms of the contract, the pertinent question is whether NCB breached its contract with Mrs. Pavlovich. As explained above, this court finds that NCB did not so breach because it was following written instructions from an appropriate agent of the Plaintiff pursuant to the terms of the Custody Agreement. Therefore, there was no breach of the duty of care to the extent required by the terms of the contract.

**b. Independent Duty of Care**

■ This court also finds that there was no independent duty of care owed by NCB to Plaintiff; therefore, there can be no independent cause of action sounding in negligence. With respect to custody arrangements, courts in other jurisdictions have found similarly. For example, in the previously-cited *Abbott* case, the court held that "[b]ecause the custodian agreements specifically defined [defendant

bank]'s duties with respect to these matters, extracontractual tort duties regarding these matters are precluded." *Abbott*, 2001 WL 492388, at *5, 2001 U.S. Dist. LEXIS 6214, at *32. Additionally, in *Yochim v. First of America Bank–Michigan N.A.*, 1994 WL 791186, 1994 U.S. Dist. LEXIS 19728 (E.D.Mich. Dec. 16, 1994), the court dismissed the negligence claim where the custodian bank had not breached its contractual duties and plaintiffs did not identify "any other independent duties." *Id.* at *9, 1994 U.S. Dist. LEXIS 19728 at *30. Plaintiff argues that these cases should not be followed because they apply law in jurisdictions that do not recognize independent tort recovery in contract cases; however, this court finds them apposite because Ohio law similarly does not allow *independent* tort recovery in cases where the relationship between the parties is governed purely by agreement.

For the above reasons, this court finds that there are no material facts in dispute regarding Plaintiff's negligence claim. Therefore, as to Count IV of Plaintiff's Complaint, negligence, Defendant's Motion for Summary Judgment is granted.

**5. Aiding and Abetting (Count VII)**

Defendant moves for summary judgment as to Count VII of Plaintiff's Complaint, aiding and abetting. Defendant argues that Ohio law does not recognize such a claim and, in the alternative, that there are insufficient facts to demonstrate that NCB had knowledge of the tortious conduct of Cashel. Plaintiff argues that NCB had a general awareness of Cashel's unlawful conduct and permitted it to the extent that it participated in the "rollover transactions."

**a. Ohio Law**

Ohio law is unclear with respect to the existence of a common law cause of action for aiding and abetting fraud. The Ohio Supreme Court, in *Great Central Insur-*

ance Company v. Tobias, 37 Ohio St.3d 127, 524 N.E.2d 168 (1988), considered Section 876(b) of the Restatement of the Law 2d, Torts (1979),[6] in determining whether liability attaches to one who purchases liquor in a tavern for a fellow patron. Ultimately, the Tobias Court held that the argument was not well-taken because § 876(b) requires the threshold finding that the principal actor's behavior amounted to tortious conduct, a finding that the court could not make. However, it alluded to the possibility that aiding and abetting fraud could be actionable under Ohio law. Tobias, 524 N.E.2d at 172; see also Aetna Cas. & Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 533 (6th Cir. 2000) ("[W]e conclude that the Supreme Court of Ohio would recognize aiding and abetting liability if squarely faced with the issue."); cf. Javitch v. First Montauk Fin. Corp., 279 F.Supp.2d 931, 941 (N.D.Ohio 2003) (denying summary judgment on the basis that determining whether defendant had aided and abetted fraud involved questions of fact).

On the other hand, lower Ohio courts have held that such a cause of action does not exist under Ohio law. For example, in Federated Management Co. v. Coopers & Lybrand, 137 Ohio App.3d 366, 738 N.E.2d 842 (2000), the Ohio Court of Appeals held that "Ohio does not recognize a claim for aiding and abetting common law fraud." Id. at 853. That court held that "one is liable if one actually engages in conduct that is wrongful. Thus, one is not liable as an aider and abettor but as an active wrongdoer. Such person would be liable

under a claim for fraud—not as an aider and abettor of fraud." Id; see also Collins v. Nat'l City Bank, 2003 WL 22971874, *5, 2003 Ohio App. LEXIS 6230, *13 (Dec. 19, 2003) ("The [trial] court correctly held that aiding and abetting common law fraud is not cognizable in law.").

### b. Analysis

██ Even though there is uncertainty in the law, this court need not choose which line of cases to follow Assuming, arguendo, that this court follows the Tobias line of cases, NCB is nevertheless not liable. "Section 876(b) requires two elements: (1) knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act." Aetna, 219 F.3d at 533 (quoting Andonian v. A.C. & S., Inc., 97 Ohio App.3d 572, 647 N.E.2d 190, 191 (1994)). First, as explained above, NCB was not aware that Cashel's conduct constituted a breach of duty. See III.A.1.d., supra. Although the law is also in conflict as to whether "actual knowledge of the primary party's wrongdoing" is required or whether a "general awareness of [the aider and abettor]'s role in the other's tortious conduct," Aetna, 219 F.3d at 534, this court concludes that NCB had neither. NCB had no duty to review the investment recommendations made by Cashel. (Pl.'s Mot. for Partial Summ. J., Ex. 1 at ¶ 5.) Furthermore, Mrs. Pavlovich never shared her investment goals with NCB so as to

6. Section 876 ("Persons Acting in Concert") provides: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
(a) does a tortious act in concert with the other or pursuant to a common design with him, or
(b) knows that the other's conduct constitutes a breach of duty and gives substantial

assistance or encouragement to the other so to conduct himself, or
(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." Restatement (Second) of Torts § 876 (1979).

make NCB aware that Cashel was perhaps overstepping its discretion, L. Pavlovich Dep. at 130–31, and she never objected to NCB after receiving and reading her monthly statements. Additionally, neither NCB employee responsible for administering Mrs. Pavlovich's Account saw anything to raise a concern of possible fraud on the part of Cashel. (A. Moore Dep. at 144–45; F. Dinda Dep. at 123–24.) Finally, as discussed above, Mr. Pavlovich's January 2000 phone call was too vague to put NCB on notice of Cashel's tortious conduct.

Therefore, this court finds that there is no evidence that NCB had either "actual knowledge" or a "general awareness" of Cashel's tortious conduct. Thus, this court concludes that there is no genuine issue of material fact as to whether NCB is liable for aiding and abetting in that tortious conduct.[7] Because of this finding, it is not necessary to determine whether NCB provided "substantial assistance or encouragement to the primary party in carrying out the tortuous act."

For the above reasons, this court finds no material fact in dispute regarding Plaintiff's aiding and abetting claim. Therefore, as to Count VII of Plaintiff's Complaint, aiding and abetting tortuous conduct, Defendant's Motion for Summary Judgment is granted.

### 6. Conclusion

For the above reasons, this court views Defendant's arguments as to Count I, Count II, Count III, Count IV, and Count VII of Plaintiff's Complaint as well taken.

### B. *Plaintiffs' Motion for Summary Judgment*

#### 1. Breach of Contract (Count I)

For the reasons stated above, as to Count I of Plaintiff's Complaint, breach of contract, Plaintiff's Motion for Partial Summary Judgment is denied.

#### 2. Unauthorized Wire Transfers (Count III)

For the reasons stated above, as to Count III of Plaintiff's Complaint, unauthorized wire transfers, Plaintiff's Motion for Partial Summary Judgment is denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 66) is granted and Plaintiff's Motion for Summary Judgment (ECF No. 70 (refiled as ECF No. 83)) is denied. The remaining claims by the other parties in this action—third party defendants and intervenors—are derivative of the main claim by Plaintiff against NCB. Since the court hereby enters judgment for NCB and no liability can accrue from NCB to the remaining parties, the remaining claims are consequently dismissed.

IT IS SO ORDERED.

---

7. In rather conclusory fashion, Plaintiff argues that NCB should have had a general awareness of the tortuous conduct after having observed the rollover transactions, the rise and fall of the available cash balance in the Pavlovich Account, and the institution of the five-day rule in January 2000. However, this evidence, without more, does not give rise to a genuine issue of material fact. Plaintiff has not offered any evidence that these events were either caused by or the result of Defendant's knowledge of tortuous conduct on the part of Cashel.