RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0040p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LAUREN M. PAVLOVICH,

*Plaintiff-Appellant,*

*v.*

No. 04-4372

NATIONAL CITY BANK,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-01120—Solomon Oliver, Jr., District Judge.

Argued: December 8, 2005

Decided and Filed: January 9, 2006[*]

Before: MERRITT, MARTIN, and COLE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Peter A. Hessler, WEGMAN, HESSLER & VANDERBURG, Cleveland, Ohio, for Appellant. Geoffrey J. Ritts, JONES DAY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Peter A. Hessler, Angela M. Privitera, Karl R. Wetzel, WEGMAN, HESSLER & VANDERBURG, Cleveland, Ohio, for Appellant. Geoffrey J. Ritts, James P. Burke, JONES DAY, Cleveland, Ohio, John M. Newman, Jr., JONES DAY, Washington, D.C., for Appellee.

---

**OPINION**

---

MERRITT, Circuit Judge. Plaintiff Lauren M. Pavlovich invested a small fortune in Rx Remedy, Inc. ("Rx Remedy"), a privately-held health care company, with a dubious financial record. A half-decade and a million-and-a-half dollars in losses later, Ms. Pavlovich now is trying to blame defendant National City Bank ("the Bank") for following her investment instructions and those of her unscrupulous investment advisor, Cashel Management Company ("Cashel"). The District Court granted summary judgment in favor of the Bank as to all claims and denied Ms. Pavlovich's motion for partial summary judgment. For the reasons set forth below, we affirm.

---

[*] This decision was originally issued as an "unpublished decision" filed on January 9, 2006. On January 20, 2006, the court designated the opinion as one recommended for full-text publication.

**I.**

In 1992, the Mooney family sold its business, Mooney Chemical.  Plaintiff Lauren (Mooney) Pavlovich received approximately $2.5 million after taxes from selling her share.  Her brother, Bob Mooney, advised Ms. Pavlovich, as well as other family members, to invest the proceeds under the direction of Cashel, an investment company led by Bob Mooney's childhood friend Tom Durkin. That same year, Ms. Pavlovich and Cashel executed an Investment Management Contract ("Cashel Contract") giving Cashel "complete discretion with respect to the investments of your funds and the execution of purchase and/or sale orders through one or more broker-dealers and/or registered representatives as [Cashel] deems appropriate."

Since the Cashel Contract precluded Cashel from having custody of her funds, Ms. Pavlovich simultaneously signed a Custody Agreement with the Bank that generally required the Bank to follow her written instructions regarding investment of the funds entrusted to the Bank.  Also in 1992, a Trading Letter apparently executed by her granted Cashel "sole trading authority" over her "Fixed Income Account" and directed the Bank "to accept all trades from [Cashel] unless notified to the contrary . . . ."[1]

Pursuant to these three documents, in 1995, Cashel began directing the Bank to disburse some of her funds in Rx Remedy.  This privately-held company sold health care information from its large database, published a magazine, and, starting in 1997, provided personalized consumer health news on the internet.  Ms. Pavlovich's initial disbursement purchased stock in Rx Remedy. As the millennium approached, Rx Remedy became increasingly starved for cash.  The company's net losses compounded each year, and its owners' equity decreased over seventy-five-fold in five years to a whopping -$37.8 million by the spring of 1999.  Cashel heeded Rx Remedy's calls for cash by, between 1998 until well into 2000, investing the money of Ms. Pavlovich and other clients each month in Rx Remedy promissory notes bearing 12% interest with warrants to buy Rx Remedy stock.[2]

As she later testified, Ms. Pavlovich understood that this was a risky strategy; but it was one with the potential for a big payoff: by the summer of 1999, the company's management propagated the prospect of an initial public offering (IPO) to capitalize on the booming demand for internet IPOs.  That same summer Ms. Pavlovich and her husband agreed with Tom Durkin to increase her investments in Rx Remedy to generate more income.

To prop up Rx Remedy and conceal the true state of Ms. Pavlovich's investment funds, Cashel devised a scheme of "rollover transactions" that eventually depleted her account:

> Typically, at the beginning of each month, Cashel requested money to be wired from the Account to Rx Remedy's account; then on the last day of the month, a Cashel representative would hand deliver to NCB a check in the amount of the earlier wire transfer plus "interest" for deposit into the Account.  This pattern of transactions would begin again on the first day of the next month.  The net effect of these repeated transactions was that even before the funds represented by the checks had

---

[1] There is some dispute as to whether Ms. Pavlovich actually signed the Trading Letter.  The copy of the letter in the record does not bear her signature, and she does not recall signing it.  However, she maintains on appeal that she executed the Trading Letter, and, in any event, the document would have been required in order to have opened the custodial account in the first place.  Taking the facts in the light most favorable to Ms. Pavlovich, *see* Fed. R. Civ. P. 56(c), Ms. Pavlovich executed the Trading Letter.

[2] As discussed below, Ms. Pavlovich strenuously disputes this characterization, claiming instead that the Bank simply transferred money to Rx Remedy without a stated purpose at Cashel's request.

been deposited into the Account, those same funds had already been wired back to
Rx Remedy.

*Pavlovich v. Nat'l City Bank*, 342 F. Supp. 2d 718, 721 (N.D. Ohio 2004). The Bank provided Ms. Pavlovich with monthly statements depicting these transactions. In January of 2000, the Bank instituted a "five day rule" prohibiting the Bank from approving "any wire transfers from Cashel which were dependent on funds that had been deposited by check less than five days earlier." *Id.* at 722. That same month, Ms. Pavlovich's husband called the Bank to complain about these transactions, but no written correspondence terminated Cashel's management authority until late 2000. By then, Ms. Pavlovich had lost roughly a million-and-a-half dollars once Rx Remedy filed for bankruptcy.

On April 12, 2001, Ms. Pavlovich sued the Bank in state court in Ohio, alleging various claims under state and federal law. The Bank timely removed the case to federal court on the basis of federal question jurisdiction. She subsequently amended her complaint to assert diversity jurisdiction. Approximately a year after that amendment, she again amended her complaint to withdraw those counts presenting federal questions. Ms. Pavlovich now appeals the District Court's grant of the Bank's motion for summary judgment on all claims, and denial of Ms. Pavlovich's motion for partial summary judgment on Counts I and III.

## II.

### A. Jurisdiction

The District Court had diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because, when the suit was initiated, Ms. Pavlovich was domiciled in Florida and the Bank was a citizen of Ohio.[3] *See Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 574 (2004) ("To our knowledge, the Court has never approved a deviation from the rule articulated by Chief Justice Marshall in 1829 that '[w]here there is *no* change of party, a jurisdiction depending on the condition of the party is governed by that condition, as it was at the commencement of the suit.' ") (quoting *Conolly v. Taylor*, 27 U.S. 556, 565 (1829)) (emphasis in original). This Court has jurisdiction under 28 U.S.C. § 1291 since the District Court's order at issue here was a final decision.

### B. Standard of Review

We review a district court's grant of summary judgment *de novo*. *Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(c)). We must take the facts in the light most favorable to the non-moving party. *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1000 (6th Cir. 2005).

---

[3]The District Court improperly cited federal question jurisdiction as the basis of its subject-matter jurisdiction. As noted earlier and discussed below in footnote 5, Ms. Pavlovich amended her complaint to remove all claims arising under federal law.

## III.

### A. Breach of Contract (Count I)

Ms. Pavlovich argues that the Bank breached the Custody Agreement by following Cashel's purportedly unauthorized instructions to direct money to Rx Remedy. This claim is without merit because the Bank's disbursements pursuant to Cashel's written directives were authorized by relevant agreements and, in any event, Ms. Pavlovich ratified the Bank's activities.

Under Ohio law, contract interpretation is a matter of law when a contract's terms are clear and unambiguous. *See Long Beach Ass'n, Inc. v. Jones*, 697 N.E.2d 208, 209-10 (Ohio 1998). To establish a breach of contract, a plaintiff must show that a contract existed, the plaintiff performed, the defendant breached, and the plaintiff suffered damages. *Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.*, 807 N.E.2d 953, 957 (Ohio Ct. App. 2004). Since the other elements are undisputed, the only issue here is whether the Bank breached the Custody Agreement.

The Custody Agreement required the Bank to "be responsible for the safekeeping of" Ms. Pavlovich's investment assets entrusted to the Bank. Paragraph nine of the Custody Agreement further provided:

> The Custodian may safely rely and act upon any written direction delivered to it as provided herein, if purported to have been signed by me or by any one or more persons specifically authorized in writing by me and reasonably believed by the Custodian to be genuine. The Custodian may rely upon the continuance of any such authorization until notified in writing to the contrary . . . .

In paragraph five, the Custody Agreement also limited the Bank's obligations with respect to investment recommendations:

> The Custodian shall have no duty to and shall not review or make investment recommendations with respect to any property held hereunder. The Custodian shall sell, exchange, invest, and otherwise deal with the property only as I may direct in writing.

As noted above, the concurrently executed Trading Letter gave Cashel "sole trading authority" over her "Fixed Income Account" and required the Bank "to accept all trades from [Cashel] unless notified to the contrary . . . ."

The now disputed transactions involving Rx Remedy fell wholly within the framework of the Custody Agreement and the Trading Letter and persisted for several years without written objection. The Trading Letter provided written authorization, as required by the Custody Agreement, for Cashel to direct the investment of Ms. Pavlovich's funds. Cashel exercised that authority by directing investments in Rx Remedy. The Bank had no reason to doubt the genuineness of Cashel's authorization; after all, she had granted Cashel in the Cashel Contract "complete discretion" to invest her money. *See Yochim v. First of Am. Bank-Michigan*, No. 91-76283, 1994 U.S. Dist. LEXIS 19728, at **25-26 (E.D. Mich. Dec. 16, 1994) (holding that, even where the plaintiffs alleged "obvious self-dealing," the custodian bank "was authorized to act on instructions of [a third party] it believed were genuinely made on behalf of clients"). The Bank did not violate the Custody Agreement by weighing in on her risky investment strategies, but, instead and unfortunately for her, followed Cashel's written directions "to a tee." *See Abbott v. Chem. Trust*, No. 01-2049-JWL, 2001 U.S. Dist. LEXIS 6214, at *47 (D. Kan. Apr. 26, 2001) (upholding a custodian agreement which required the bank to determine whether a particular investment was administratively feasible, but not whether it was fraudulent). Moreover, the Bank's delay in instituting the five day rule was not a breach of the contract because the rule was not contractually

required. She received monthly statements depicting these transactions but did not terminate Cashel's authority until late 2000. When she did so, the Bank honored that written direction.

Ms. Pavlovich's primary argument to the contrary is that the Trading Letter limited Cashel's authority to executing "trades" as opposed to simply transferring money without a stated purpose. This argument borders on the frivolous because, at least until the commencement of litigation, it was undisputed that the challenged disbursements purchased promissory notes with 12% interest and warrants to buy Rx Remedy stock. Ms. Pavlovich and her husband agreed with this characterization in their deposition testimonies. In a letter to Ms. Pavlovich's husband and other investors, Bob Mooney, the apparent "brains" behind the family's investments in Rx Remedy, described the investments as "loans" paying 12% interest "and about 18 warrants per $1000 per year." Moreover, Ms. Pavlovich reported over $50,000 in interest income from Rx Remedy on her tax returns. Thus, since her money was exchanged for notes and warrants – albeit investments of dubious value – "trades" occurred.

Even if the transactions were somehow outside the scope of the Custody Agreement and Trading Letter, Ms. Pavlovich ratified the Bank's disbursements pursuant to Cashel's directives, in the words of the District Court, "by accepting its actions and their consequences over the course of several years." *Pavlovich v. Nat'l City Bank*, 342 F. Supp. 2d 718, 725 (N.D. Ohio 2004). "Ratification may be implied when there is actual knowledge of an agreement, acceptance of its benefits and a failure to repudiate within a reasonable time." *Young v. Int'l Bhd. of Locomotive Eng'rs*, 683 N.E.2d 420, 425 (Ohio Ct. App. 1996); *see also Campbell v. Hospitality Motor Inns, Inc.*, 493 N.E.2d 239, 242 (Ohio 1986) (per curiam). Ms. Pavlovich had actual knowledge of the Bank's disbursements pursuant to Cashel's investment decisions over her funds, as manifested by her deposition testimony and receipt of monthly statements for multiple years depicting the challenged transactions. She accepted the benefits of this investment activity by accepting the interest the notes paid and reporting the interest as income on tax returns. She further failed to repudiate Cashel's authority until roughly eight years after that authority was granted. This case resembles others holding that a failure timely to object to transactions depicted in bank statements generally amounts to ratification. *See White Castle Sys. v. Huntington Nat'l Bank, Columbus*, 43 N.E.2d 737, 741 (Ohio Ct. App. 1941); *First Nat'l Bank of Philadelphia v. Farrell*, 272 F. 371, 376 (3d Cir. 1921); *V. H. Juerling & Sons, Inc. v. First Nat'l Bank of Richmond, Indiana*, 242 N.E.2d 111, 119 (Ind. Ct. App. 1968). Ms. Pavlovich argues to the contrary based on Cashel's fraud in concealing the true nature of the transactions and on Ohio law's ban on ratifying illegal conduct. These arguments focus on Cashel's actions, not those of the Bank, and are unavailing because nothing the Bank did was fraudulent or otherwise unlawful.

Ms. Pavlovich further argues that she did not ratify transactions occurring after a phone call from her husband to the Bank in January of 2000. In that conversation, Mr. Pavlovich recalled telling a Bank representative that "these transfers are not supposed to happen." Even assuming that this instruction contained sufficient content to defeat ratification, the Custody Agreement prevented the Bank from heeding this direction because Mr. Pavlovich was not a party to the Custody Agreement and because the communication was not in writing as required by the Custody Agreement.

## B. Breach of Fiduciary Duties (Count II)

Ms. Pavlovich claims that the Bank breached a variety of fiduciary duties including the duty of good faith and the duty to disclose material facts. This claim also fails because the Bank upheld its narrow and primary fiduciary duty not to make unauthorized distributions and because no applicable fiduciary duty imposed any obligation separate from, and in addition to, that imposed on the Bank by the relevant agreements.

An agency relationship between the Bank and Ms. Pavlovich was created through execution of the Custody Agreement. Under Ohio law, there are four elements of an agency relationship: "Agency is the fiduciary relation which results from [1] the manifestation of consent by one person to another that the other shall [2] act on his behalf and [3] subject to his control, and [4] consent by the other so to act." *Berge v. Columbus Cmty. Cable Access*, 736 N.E.2d 517, 531 (Ohio Ct. App. 1999) (quoting Restatement (Second) of Agency § 1 (1958)). By executing the Custody Agreement and Trading Letter, Ms. Pavlovich manifested consent to the Bank's custody of her funds and its compliance with Cashel's investment directives. The Bank acted on her behalf, and consented to do so, in making distributions according to the Custody Agreement and Trading Letter. The Bank was subject to her control because she had the sole power to authorize transactions or to delegate that power and could have terminated the relationship at any time.

An agency relationship gives rise to those fiduciary duties within the scope of the agency. *See Miles v. Perpetual Savs. & Loan Co.*, 388 N.E.2d 1364, 1365 (Ohio 1979) (per curiam). The key issue here, therefore, is determining the scope of the agency and whether the accompanying fiduciary duties differ from the Bank's contractual obligations. Ms. Pavlovich's account was administrative and nondiscretionary in that the Bank would not distribute funds absent written direction from her or an authorized third party. *See Merrill Lynch Pierce Fenner & Smith, Inc. v. Cheng*, 901 F.2d 1124, 1128 (D.C. Cir. 1990) ("With respect to a non-discretionary account, the customer must give prior approval for all transactions."). In such nondiscretionary situations, a bank owes primarily the very narrow fiduciary duty not to make unauthorized distributions. *See Abbott v. Chem. Trust*, No. 01-2049-JWL, 2001 U.S. Dist. LEXIS 6214, at *43 (D. Kan. Apr. 26, 2001) ("[T]o the extent [the Bank] owed a fiduciary duty to plaintiffs, that duty was limited to executing the transactions requested by plaintiffs."); *cf. Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 412 (5th Cir. 1998) ("[W]here the investor controls a nondiscretionary account and retains the ability to make investment decisions, the scope of any duties owed by the broker will generally be confined to executing the investor's order."); *Hill v. Bache Halsey Stuart Shields*, *Inc.*, 790 F.2d 817, 824 (10th Cir. 1986) (The fiduciary duty owed by a broker operating a nondiscretionary trading account is "very narrow -- primarily not to make unauthorized trades."). In the instant case, the Bank did not violate its primary fiduciary duty not to make unauthorized distributions because all of its disbursements were directed by Cashel pursuant to Ms. Pavlovich's written authorization.

In addition, having concluded that no breach of contract occurred, we cannot now find a breach of a fiduciary duty where Ms. Pavlovich has identified no applicable fiduciary duty separate from, and in addition to, that imposed on the Bank by the Custody Agreement and Trading Letter. It is well established in Ohio that "[t]he duties of an agent to his principal are dependent upon the agreement between them." *Orvets v. Nat'l City Bank, Northeast*, 722 N.E.2d 114, 119 (Ohio Ct. App. 1999); *see also Gem Sav. Ass'n v. Sterling Gold Props., Ltd.*, No. 12719, 1992 Ohio App. LEXIS 4965, at *16 (Ohio Ct. App. Oct. 2, 1992) ("[T]he fact that this contract created an agency relationship between [the parties] did not, without more, impose a fiduciary duty upon [the agent] which was separate from, and in addition to, that imposed on it by the contract."); Restatement (Second) of Agency § 376 (1958) ("The existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties . . . ."). The Bank honored its contractual obligations and was bound to no fiduciary duty outside the terms of the relevant agreements.

### C. Unauthorized Wire Transfers (Count III)

Ms. Pavlovich's unauthorized wire transfers claim also has no merit because Cashel had actual and apparent authority to direct disbursements from the custody account and because Ms. Pavlovich ratified Cashel's directives. Under Ohio's adoption of Uniform Commercial Code provisions pertaining to wire transfers, a bank must refund its customers the amount of any unauthorized transfers. *See* Ohio Rev. Code Ann. § 1304.59(A) (West 2005). A payment order is

authorized if the person identified as the sender "authorized the order or is otherwise bound by it under the law of agency."[4]   Ohio Rev. Code Ann. § 1304.57(A) (West 2005).   The official comments confirm that "[t]he issue is one of actual or apparent authority of the person who caused the order to be issued in the name of the customer." Ohio Rev. Code Ann. § 1304.58 cmt. 1 (West 2005).

Cashel had actual authority in directing the disbursements.  Actual authority is the authority that the principal intentionally grants to an agent.  *See Nat'l City Bank v. Rhoades*, 779 N.E.2d 799, 804 (Ohio Ct. App. 2002) (citing Restatement (Second) of Agency § 7 (1958)).  By executing the Investment Management Contract with Cashel, Ms. Pavlovich expressly granted "complete discretion" to Cashel to invest her funds.  It is difficult to imagine a more intentional grant of actual authority.  *See Grabowski v. Bank of Boston*, 997 F. Supp. 111, 124 (D. Mass. 1997) ("If [a third party] had general authority over the account, the Bank is not liable for" the third party's unauthorized withdrawals.).

In addition, Cashel had apparent authority to direct the Bank's disbursements.  Apparent authority is "the power to affect the legal relations of another person by transactions with third persons . . . arising from . . . the other's manifestations to such third persons." *Master Consol. Corp. v. BancOhio Nat'l Bank*, 575 N.E.2d 817, 822 (Ohio 1991) (quoting Restatement (Second) of Agency § 8 (1958)).  Ms. Pavlovich made a direct manifestation to the Bank of Cashel's authority to direct the investments of her funds when she executed the Trading Letter and Custody Agreement.  As discussed above, the Trading Letter authorized the precise activity of which Ms. Pavlovich now complains.

Under Ohio's agency law, a principal may ratify the conduct of her agent even if that conduct was initially unauthorized so that the conduct becomes binding on the principal.  *See Campbell v. Hospitality Motor Inns, Inc.*, 493 N.E.2d 239, 240 (Ohio 1986) (per curiam).  Ms. Pavlovich ratified Cashel's authority to direct her investments because of her actual knowledge of the transactions coupled with her acceptance of their benefits and her failure to repudiate within a reasonable period of time.  *See id.* at 242; *Young v. Int'l Bhd. of Locomotive Eng'rs*, 683 N.E.2d 420, 425 (Ohio Ct. App. 1996).

### D. Negligence (Count IV) and Ohio's Economic-Loss Rule

Ms. Pavlovich claims that the Bank was negligent in failing to administer her account with ordinary care and to safe-keep her investment assets.  This negligence claim is barred by Ohio's economic-loss rule in that, although there is privity of contract between her and the Bank, recovery for purely economic loss is not based upon a tort duty independent of contractually created duties.

Under Ohio law, "[t]he economic-loss rule generally prevents recovery in tort of damages for purely economic loss." *Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc.*, 835 N.E.2d 701, 704 (Ohio 2005).  The economic-loss rule applies in a tort action only when economic loss is unaccompanied by personal injury or property damage.  *See Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 629-30 (Ohio 1989).  Economic losses include not only diminution in value and consequential losses like lost profits, *see id.* at 629, but also, as the term's name implies, the loss of electronic funds and failed investments.  *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 395 F. Supp. 2d 183, 204 (M.D. Pa. 2005) (money lost through unauthorized credit card charges was purely economic loss); *McCutcheon v. Kidder, Peabody & Co.*, 938 F. Supp. 820, 823 (S.D. Fla. 1996) (applying the economic-loss rule to a securities case); *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267, 1269-70 (Colo. 2000) (en banc) (losses from cattle investment program were purely

---

[4] A bank may also avoid responsibility for improper transfers if the transfer is "verified" pursuant to a statutory provision not applicable here.  *See* Ohio Rev. Code Ann. § 1304.57(B) (West 2005).

economic losses); *Calcagno v. Personalcare Health Mgmt., Inc.*, 565 N.E.2d 1330, 1339 (Ill. App. Ct. 1991)("Economic losses encompass objectively verifiable monetary losses . . . ."). Following this authority, Ms. Pavlovich's monetary losses from funds disbursed to Rx Remedy were purely economic losses.

Ohio law prevents the recovery of purely economic losses in a negligence action either where there is no "privity or a sufficient nexus that could serve as a substitute for privity" or where recovery of such damages is not based upon a tort duty independent of contractually created duties. *See Corporex Dev. & Constr. Mgmt., Inc.*, 835 N.E.2d at 703, 705; *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 678 N.E.2d 519, 529 (Ohio 1997). In the instant case, the Custody Agreement and Trading Letter created privity of contract. However, Ms. Pavlovich has not identified any tort duty owed by the Bank independent of contractually created obligations. With respect to similar custody arrangements, courts in other jurisdictions have prevented plaintiffs from bringing tort actions where the defendant bank owed no duty of care independent of its contractual obligations. *See Abbott v. Chem. Trust*, No. 01-2049-JWL, 2001 U.S. Dist. LEXIS 6214, at *32 (D. Kan. Apr. 26, 2001) ("Because the custodian agreement specifically defined [the bank's] duties with respect to these matters, extracontractual tort duties regarding these matters are precluded."); *Yochim v. First of Am. Bank-Michigan*, No. 91-76283, 1994 U.S. Dist. LEXIS 19728, at **29-30 (E.D. Mich. Dec. 16, 1994) ("Because the Court has found that [the bank] did not breach its fiduciary or contractual duties, and because plaintiffs have not identified any other independent duties allegedly breached by [the bank], [the negligence count] will be dismissed."). Accordingly, we hold that the economic-loss rule bars Ms. Pavlovich's negligence claim.

### E. Aiding and Abetting Tortious Conduct (Count VII)

Ms. Pavlovich's final allegation is that the Bank aided and abetted the tortious conduct of Cashel and others generally by executing Cashel's instructions to transfer money from her custodial account. This claim also must fail because Ohio law is unsettled whether this cause of action exists and, regardless, Ms. Pavlovich cannot establish a prima facie case.

It is unclear whether Ohio recognizes a common law cause of action for aiding and abetting tortious conduct.[5] *Compare Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 533 (6th Cir. 2000) ("[W]e conclude that the Supreme Court of Ohio would recognize aiding and abetting liability if squarely faced with the issue . . . .") *with Federated Mgmt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 853 (Ohio Ct. App. 2000) ("Ohio does not recognize a claim for aiding and abetting common-law fraud."); *see also Pavlovich v. Nat'l City Bank*, 342 F. Supp. 2d 718, 734-36 (N.D. Ohio 2004) (discussing this conflict in more detail).

Even if the Supreme Court of Ohio would recognize this claim, Ms. Pavlovich would not prevail. Section 876(b) of the Second Restatement of Torts provides the basis for "modern application of civil aiding and abetting" and requires two elements: "(1) knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act." *Aetna Cas. & Sur. Co.*, 219 F.3d at 532-33 (quoting *Andonian v. A.C. & S., Inc.*, 647 N.E.2d 190, 192 (Ohio Ct. App. 1994)). The first element requires a showing of "actual knowledge," or perhaps merely "general awareness," of the primary party's wrongdoing.

---

[5]A cause of action for aiding and abetting tortious conduct is created, if at all, by Ohio law. Although the Bank argues that this claim raises a federal question, the Bank has fallen far short of convincing us not to apply Justice Holmes' statement, as more recently interpreted by the Supreme Court, that, in the "vast majority" of cases, a "suit arises under the law that creates the cause of action." *See Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 808 (1986) (quoting *Franchise Tax Bd. of the State of California v. Constr. Laborers Vacation Trust for S. California*, 463 U.S. 1, 8-9 (1983), and *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916)) (internal quotation marks omitted).

S*ee id.* at 533-34.  Ms. Pavlovich can establish neither for the reasons the District Court aptly recounted:

> NCB had no duty to review the investment recommendations made by Cashel. Furthermore, Mrs. Pavlovich never shared her investment goals with NCB so as to make NCB aware that Cashel was perhaps overstepping its discretion . . . and she never objected to NCB after receiving and reading her monthly statements. Additionally, neither NCB employee responsible for administering Mrs. Pavlovich's Account saw anything to raise a concern of possible fraud on the part of Cashel. Finally . . . Mr. Pavlovich's January 2000 phone call was too vague to put NCB on notice of Cashel's tortious conduct.
>
> In rather conclusory fashion, Plaintiff argues that NCB should have had a general awareness of the tortuous conduct after having observed the rollover transactions, the rise and fall of the available cash balance in the Pavlovich Account, and the institution of the five-day rule in January 2000.  However, this evidence, without more, does not give rise to a genuine issue of material fact.  Plaintiff has not offered any evidence that these events were either caused by or the result of Defendant's knowledge of tortuous conduct on the part of Cashel.

*Pavlovich*, 342 F. Supp. 2d at 735-36 (internal citations to the record omitted).  Accordingly, whether or not Ohio law recognizes a common law action for aiding and abetting tortious conduct, Ms. Pavlovich's claim fails.

## IV.

Since none of Ms. Pavlovich's claims present triable issues, we do not address whether the Uniform Fiduciary Act, Ohio Rev. Code Ann. § 1339.03-.13 (West 2005), as adopted in Ohio protects the Bank from liability.  For the foregoing reasons, we affirm the District Court's grant of summary judgment in favor of the Bank, and denial of Ms. Pavlovich's motion for partial summary judgment.